LIPEZ, Circuit Judge,
dissenting.
The majority opinion is a curious blend of intimations and unjustified inferences. With its invocation of our authority to infer the reasoning of the able and experienced district court judge, who said that he “had given considerable time and thought to what the sentences would be,” the majority intimates that we should defer to the decision of the judge even in the absence of any explanation of his decision that appellant occupied a position of trust within the meaning of the guidelines. With its repeated invocation of the conclusory assertion of the PSR that Sicher exercised managerial discretion in carrying out her work for the CGF, an essential characteristic of a position of trust, the majority intimates that there is evidence in the record to support that assertion. Yet when the majority tries to identify specific instances of the exercise of such discretion, there is only an empty record. Therefore, I respectfully dissent.
In Part I of the dissent, I set forth the law that applies to the position of trust enhancement. In Part II, I apply the law to the facts of this case, first addressing appellant’s work as a secretary for Dr. Walton’s medical office and then her work for the Children’s Glaucoma Foundation (“CGF”). Although the majority chooses not to discuss appellant’s work as secretary to the medical office, I must do so because of my view that the position of trust enhancement was improperly applied. In my discussion of the application of the law to Sicher’s work with the CGF, I focus on the errors in the majority’s analysis.[10]
I.
United States Sentencing Guidelines section 3B1.3 calls for a two-level upward adjustment when “the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense.” The application notes to this provision explain that a position of public or private trust refers to one “characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).” U.S.S.G. § 3B1.3 cmt. n. 1. The notes further explain that:
Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant’s responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client’s funds by an attorney serving as a guardian, a bank executive’s fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of. an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

Id.

We require sentencing courts to conduct a two-step inquiry to determine whether *76 the section 3B1.3 enhancement applies to a particular defendant. See United States v. Reccko, 151 F.3d 29, 31 (1st Cir.1998). First, a court must determine whether a defendant occupied a “position of trust” within the meaning of the guideline. We have called this the “status question.” United States v. Parilla-Román, 485 F.3d 185, 190-91 (1st Cir.2007). If the defendant’s job does not meet that description, the inquiry ends and the enhancement does not apply. If, however, a court answers the status question affirmatively, it should proceed to the second step of the inquiry and ask whether the defendant used her position of trust to facilitate or conceal her offense. Reccko, 151 F.3d at 31; Parilla-Román, 485 F.3d at 190. It is error to conflate these two steps by determining that a defendant “held a position of trust precisely because her job enabled her to commit the crime.” Reccko, 151 F.3d at 32; see also Parilla-Román, 485 F.3d at 191 (“[I]t does not follow that, merely because a defendant’s position enables him to commit an offense, the position must have been unsupervised and, thus, a position of trust.”).
With respect to the status inquiry, our cases — and the guideline itself — reveal that the requirement of managerial or professional discretion is “paramount.” United States v. Chanthaseng, 274 F.3d 586, 589 (1st Cir.2001). Labels do not matter; it is the defendant’s actual degree of discretion, not his or her job title, that controls the applicability of section 3B1.3. United States v. Gill, 99 F.3d 484, 489 (1st Cir.1996). Although positions of trust exist in many different settings, they all involve:
situation-specific decisionmaking that is given considerable deference precisely because it cannot be dictated entirely by established protocol. All of these individuals are charged with exercising their judgment in the best interest of another person or entity; this is the essence of the “professional or managerial discretion” to which the guideline refers.
United States v. Tiojanco, 286 F.3d 1019, 1021 (7th Cir.2002)[11]; see also id. at 1020-21 (describing “positions of trust” as falling into two categories: 1) “people like doctors, lawyers, and investment advisors who have (or hold themselves out as having specialized expertise that leaves the average layman ill-equipped to monitor their job performance,” and 2) employees in organizational settings who are charged with (“deciding, on a case-by-case basis, whether a particular expenditure or transfer of company funds or other valuables is necessary or beneficial to the organization”).
This focus on the presence of managerial or professional discretion is necessarily fact-intensive, and the fact patterns will vary widely from case to case. Nevertheless, our precedent provides useful guidance. For example, in Chanthaseng, 274 F.3d at 589-90, we found that a mid-level bank manager occupied a position of trust when she stole from the bank through a scheme of making false “rapid deposit” tickets for fictional large cash deposits. The defendant’s supervisor gave her the authority (against corporate rules) to countersign her own deposit tickets and failed to review her tickets, “essentially making her the branch’s sole decision-maker for those transactions.” Id. at 589. The same supervisor had also asked the defendant to look into an odd entry in the bank’s records — one which the defendant *77 in fact created to conceal her theft — 'without providing any oversight for the defendant’s subsequent investigation. Id. at 590.
We also found the position of trust enhancement applicable in United States v. O’Connell, 252 F.3d 524, 528-29 (1st Cir. 2001), where the defendant was an office manager with access to an $850,000 line of credit that he could use to transfer funds into his employer’s checking account. We concluded that “the authority to draw off the account suggests significant managerial discretion.” Id.
By contrast, we were not able to identify the presence of professional or managerial discretion in other cases. In Reecko, 151 F.3d at 30-32, we found that the section 3B1.3 enhancement was inappropriately applied to a police station receptionist and switchboard operator who was closely supervised and whose phone calls were monitored, even though her position made her privy to secret police information that she used to tip a friend to a planned drug bust. Although the defendant’s job at the station “afforded her access to information,” it “reposed in her no discernable discretion.” Id. at 32.
We also rejected the application of the enhancement in Parilla-Roman, 485 F.3d at 191, where we found that defendants had not occupied positions of trust as baggage handlers for an airline even though they had received special security clearance in connection with their employment. We noted that the defendants’ positions did not afford them discretion. Id. As our cases demonstrate, mere access to finances, secure space, or secret information does not amount to a position of trust unless the access is accompanied by the exercise of professional or managerial discretion.
Distinguishing positions with managerial authority from those without it can be difficult in the office setting, where employees often have a wide range of duties that must be scrutinized carefully to determine if they truly encompass managerial discretion. The difficult line-drawing that may be necessary in the office setting is illustrated by United States v. Tann, 532 F.3d 868 (D.C.Cir.2008). The defendant there was an office manager who was convicted of fraud for embezzling from three successive employers. Id. at 870. Her duties over the course of the three jobs included ordering equipment, scheduling travel, maintaining a check ledger (she was not authorized to sign checks), ensuring that monthly bank statements matched the ledger, making out payroll checks, handling cost records, and preparing checks to be signed by her supervisors. Id. at 870-71. Although the district court had found that Tann was “trusted to handle the finances of the organization[s],” it failed to identify any specific tasks requiring managerial discretion. Id. at 875 (modification in original) (internal quotation marks and citation omitted). In the absence of proof of such tasks, the enhancement was not applicable.[12] Id.
In United States v. Edwards, 325 F.3d 1184, 1185-86 (10th Cir.2003), the enhancement did not apply to an administrative assistant who handled accounts receivable, received customer checks in the mail and prepared them for deposit, calculated the *78 balance of customer accounts, posted payments to customer accounts, and prepared cash receipts reports that were incorporated into the company’s ledgers and financial statements. The Tenth Circuit stated that “the adjustment under § 3B1.3 is not intended to be routinely applied to every employee fraud or embezzlement case.... [T]he fact is that in every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply to every case of fraud.” Id. at 1187 (internal quotation marks and citation omitted). Because Edwards’s job “was purely ministerial and did not entail substantial discretionary judgment,” the section 3B1.3 enhancement was inappropriate. Id.
II.
In imposing the abuse of trust enhancement in this case, the district court made no factual findings on the record concerning the nature of appellant’s position and whether it required the exercise of professional or managerial discretion. The court had before it, however, the charging document to which appellant pled guilty, victim impact letters written by Dr. Walton on behalf of himself and the CGF, the victim impact testimony of Dr. Walton and parents of some of his patients, appellant’s psychiatric and compulsive gambling evaluations and, most importantly, the PSR. Appellant did not contest the objective facts set forth in any of these sources. The district court was entitled to accept those uncontested facts as true. United States v. Prochner, 417 F.3d 54, 66 (1st Cir.2005).
In contrast to the objective facts (which include, for example, the specific tasks Sicher performed, the descriptions of events occurring during the course of her fraud, and the amount of money she stole), appellant did contest a critical conclusion drawn from those facts that would, if true, support the imposition of the position of trust enhancement. Namely, she contested the PSR’s assertion that she “was given substantial professional discretion to manage the financial and administrative functions of the office,” arguing in her sentencing memorandum that her job “was not one that was ‘characterized by professional or managerial discretion.’ ” Defendant’s Sentencing Memorandum at 2 (quoting U.S.S.G. § 3B1.3). Unlike the majority, I do not merely accept the PSR’s conclusion that appellant was given substantial discretion, or the district court’s unexplained finding that “the defendant did violate a position of trust.” The district court made no subsidiary findings of fact about whether appellant’s position afforded her managerial discretion. “In a case such as this one, in which the district court announced its decision to adjust upward without any subsidiary findings of fact, we ‘review the evidence and the result, [but] not the reasoning by which the result was reached by the district court.’ ” Chanthaseng, 274 F.3d at 589 (quoting United States v. Tracy, 36 F.3d 199, 203 (1st Cir.1994)).
The majority invokes the ability of the district court to make factual determinations by drawing reasonable inferences from the evidence, and our ability to infer a sentencing court’s reasoning under certain circumstances. Those propositions, while unquestionably correct, are irrelevant to this case. Whatever the intricacies of the review process here,[13] my conclusion is that any inferences fairly drawn from the record simply do not support the eon *79 elusion that appellant occupied a position of trust.
A. Administrative Assistant to Dr. Walton’s Medical Office
The PSR states that Dr. Walton relied on appellant to “conduct his daily affairs,” giving her “substantial professional discretion to manage the financial and administrative functions of the office.” These generalities, repeated by the government in its brief, draw no support from the specific responsibilities attributed to Sicher. Her specific duties, as set forth in the PSR, included ministerial tasks such as opening mail, welcoming patients, scheduling appointments, bookkeeping, and collecting and depositing payments. These kinds of ministerial tasks do not normally require “substantial discretionary judgment that is ordinarily given considerable deference,” U.S.S.G. § 3B1.3 cmt. n. 1, and the record gives us no reason to conclude that they did in this situation. Notably, the record does not reveal that appellant had authority to make spending decisions for the medical office, prepare a budget, approve or deny spending requests, or conduct any other discretionary task with respect to the “financial and administrative functions of the office.” While is true that appellant’s responsibilities gave her the opportunity to commit her crimes, they “reposed in her no discernable discretion.” Reccko, 151 F.3d at 32; see also United States v. Spear, 491 F.3d 1150, 1154 (10th Cir.2007) (“ ‘The fact that [the defendant] was trusted by her employer with significant responsibility ... is not determinative.’ ” (alterations in original) (quoting Edwards, 325 F.3d at 1187)).
B. Administrative Assistant to the Children’s Glaucoma Foundation
The following two paragraphs are the core of the majority’s erroneous reasoning about the significance of appellant’s work for the CGF:
The record is clear that Sicher in fact exercised considerable authority and discretion as to CGF; this is necessarily so, as she was unsupervised in a number of tasks as to receipt and disbursement of funds. First, Sicher opened and reviewed CGF’s monthly bank statements and then selectively gave information to Dr. Walton, who was only shown the bottom line of the account (i.e. only the first page, which only showed the total account balance). Indeed, she exercised autonomy over incoming donations, the payments of grants to researchers (as evidenced by the non-payment to one researcher), and maintenance of the accounting logs. She was essentially unsupervised by Dr. Walton as to these responsibilities and has never claimed otherwise.
Second, as the public face of CGF, she was entrusted to host CGF fundraisers and to take steps to facilitate the fundraisers such as dealing with celebrities and distributing items for sale. She also exercised discretion as to what fundraisers would be held in CGF’s name, not even disclosing them to Dr. Walton. Regardless of the defendant’s title, she essentially took over as the de facto manager and director of CGF.
These paragraphs contain both factual and legal errors. I will deal with the factual errors first, setting forth the assertions at issue in bold print.
1. Factual Errors
a. “Sicher opened and reviewed CGF’s monthly bank statements and then selectively gave information to Dr. Walton, who was only shown the bottom line of the account (i.e. only the first page, which only showed the total account balance).”
This statement only describes the technique of Sicher’s crime; her concealment *80 of illicit transactions does not show that she was authorized to exercise managerial discretion on behalf of the CGF. While Sicher, as a bookkeeper, may have been the only one to review the itemized record of the bank account’s activity, that fact does not indicate that she was authorized to exercise discretion over the transactions reported there.
b. Sicher “exercised autonomy over incoming donations.... ”
Sicher “exercised autonomy” over incoming donations only to the extent that she was the sole person responsible for depositing them in the CGF’s bank account.[14] She exercised no authority over the funds in that account, however, because she was not permitted to choose where they should be deposited or how they should be spent. She had no authority to write checks from the CGF’s bank account.[15]
c. Sicher “exercised autonomy over ... the payments of grants to researchers.”
If this statement were true — for example, if Sicher had the authority to decide which researchers were to be paid, how much, or even when — that fact would indeed support the majority’s position that she exercised discretion in her role. However, there is no evidence to support that proposition. Certainly, the episode on which the majority relies to make the assertion (when Dr. Walton discovered appellant’s thefts because a check to a researcher was returned for insufficient funds) does not support the contention. Dr. Walton discovered the theft when, to his surprise, he saw that the check to the researcher had bounced; he knew that there should have been enough money in the account to cover it. That episode only supports the conclusion that Sicher, without the authorization or knowledge of Dr. Walton, drained the account of money. It cannot support the inference that Sicher had “complete autonomy” over research grant payments. While she might possibly have prepared the check to the researcher (a fact the record does not provide), she was, without question, unauthorized to sign it on her own.
d. Sicher “exercised autonomy over ... maintenance of the accounting logs.”
This statement is probably true. Sicher was the bookkeeper for the CGF as well as the medical office. As we indicated in O’Connell, 252 F.3d at 528-29, however, that ministerial task does not indicate the *81 use of discretionary judgment. See id. (noting that “[t]here is some support for O'ConnelFs argument that his position as a bookkeeper ... did not place him within the Guideline definition of a position of a trust,” but finding support for the imposition of the enhancement in other aspects of the defendant’s job).
e. “[A]s the public face of CGF, [Sicher] was entrusted to host CGF fundraisers and to take steps to facilitate the fundraisers such as dealing with celebrities and distributing items for sale.”
Sicher was a “host” of CGF events only in the sense that she was a greeter and a “face” of the charity. The record shows that she was called on to use her social skills on behalf of the organization, not her managerial discretion. For example, the majority focuses on an episode, described at sentencing by the mother of a patient, when Sicher gave -wristbands to two girls who sold them to raise money for the charity. The disbursement of a fundraising item, and the subsequent theft of the money raised, does not reflect the use, especially not the authorized use, of managerial discretion. Nothing in the record indicates that Sicher planned, designed, or developed the bracelet fundraiser.
f. Sicher “also exercised discretion as to what fundraisers would be held in CGF’s name, not even disclosing them to Dr. Walton.”
Nowhere does the record support the contention that Sicher exercised discretion about what fundraisers would be held. The majority apparently draws this conclusion from the testimony about a birthday party held by a former member of the CGF’s Board of Directors, who said at sentencing:
[M]y husband and I had a birthday party in our home and every guest there donated money to the foundation, directly to the foundation. But, Dr. Walton never heard of this. Because, the defendant decided rather than to give this money to research and to study, she would put it in her own pocket. She would steal from my children, from all of these children.
This testimony describes Sicher’s use of the birthday party to steal money, not her exercise of discretion in planning and implementing the party. Nor does the testimony support the more general conclusion that anything about Sicher’s position — explicitly or implicitly — gave her authority to use discretion about what fundraisers to hold.
g. “Regardless of defendant’s title, she essentially acted as the director of the CGF.”
As I have indicated, the facts belie this wishful characterization. Strikingly, Sicher was paid only an additional $150 per month for her work on behalf of the CGF. That modest increment is not surprising. Contrary to the majority’s suggestions, the record does not indicate that appellant made any decisions on behalf of the CGF, such as determining how to fundraise, setting financial goals, or choosing how to spend its money. She did not have authority to write checks, prepare the budget, or supervise employees. Appellant’s position at the CGF afforded her access to the funds she ultimately stole, but it did not require the exercise of managerial discretion.
2. Legal Errors
The majority’s opinion attempts to draw too certain a connection between the lack of supervision and the exercise of discretion. The government makes the same error in its brief, suggesting that the sec *82 tion 3B1.3 enhancement was appropriate because of Sicher’s lack of supervision and her close relationship with Dr. Walton and the families who visited his office. It is true that lack of supervision often characterizes positions that require the exercise of managerial discretion. The guideline commentary makes that very point: “[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.” U.S.S.G. § 3B1.3 cmt. n. 1. It does not follow from that observation, however, that lack of supervision of an employee means that the employee is necessarily authorized or expected to exercise professional or managerial discretion. In some circumstances, the ministerial nature of the task may not justify much supervision. Although the guideline requires the exercise of managerial or professional discretion to apply the enhancement, it only suggests that lack of supervision is one way to detect whether that discretion exists. The majority asserts the opposite, concluding that Sicher “in fact exercised considerable authority and discretion as to CGF; this is necessarily so, as she was unsupervised in a number of tasks as to receipt and disbursement of funds.”
Likewise, the majority makes the error of equating simple trust with a section 3B1.3 “position of trust,” a link long rejected by this circuit. See Reccko, 151 F.3d at 31. The majority states that, “[w]ith growing trust by an employer, and/or victim, an employee may be in fact given increasing levels of responsibility and discretion over time [ ] such that the position becomes one ‘characterized by professional or managerial discretion’ without any change in title.’ ” That observation may be apt in some circumstances, but the record does not support it here. Sicher had access to the finances of the CGF and the medical office because she was trusted, but she was not permitted to exercise her discretion over those finances.[16]
The majority also embraces the government’s argument that our decision in O’Connell, 252 F.3d 524, supports its contention that Sicher’s close relationships with Dr. Walton and the families of his patients transformed her role into a “position of trust” within the meaning of section 3B1.3. The majority describes O’Connell as holding that “the closeness of the relationship between the defendant and the victim supported the district court’s finding that the defendant occupied a position of trust.” While that is true, our decision in that case critically depended on the trusted relationship in combination with the defendant’s “unfettered access to an $850,000 line of credit” which he had “authority to transfer ... to the checking account.” Id. at 529. We stated that “the authority to draw off the account suggests significant managerial discretion,” a conclusion that was bolstered by the district court’s finding that the defendant had a close personal relationship that led to “more autonomy for O’Connell.” Id. We can accept that Sicher’s close, trusted relationships with Dr. *83 Walton and the families of his patients were comparable to the family-like relationship of O’Connell with his employer, and that this closeness gave Sicher access to money that she could embezzle. However, unlike O’Connell, appellant had no ability to exercise decision-making authority in her position as administrative assistant to the CGF.[17]
III.
There is no question that appellant committed a terrible “betrayal of trust” within the colloquial understanding of that phrase. Dr. Walton trusted her to deposit income into the medical office’s account, and his young patients and their families trusted that the CGF would benefit from the donations they gave to her for safekeeping and deposit. At sentencing, Dr. Walton and parents of his patients described the detrimental effect of appellant’s betrayal on their ability to trust others. The district court described her breach of trust as “egregious” and “an amazing violation of trust,” and I agree.
“The sentencing guidelines, however, create their own vocabulary — and the guidelines sometimes define terms in ways that might strike lay persons as peculiar. So it is here: in the idiom of the sentencing guidelines, the term ‘position of public or private trust’ has a special meaning.” Reccko, 151 F.3d at 31. As the application notes explain, the position-of-trust enhancement applies only to those positions “characterized by professional or managerial discretion (ie., substantial discretionary judgment that is ordinarily given considerable deference).” U.S.S.G. § 3B1.3 cmt. n. 1. Even accepting all of the objective facts set forth in the PSR and elsewhere in the record as true (as the district court was entitled to do in the absence of any challenge to them), the facts are insufficient to support the imposition of the position of trust enhancement because they do not indicate that appellant had a position that afforded her discretion. If one looks beyond the PSR’s conclusory assertion that appellant had discretion “to run the financial and administrative affairs of the office,” and the district court’s unexplained application of the position of trust enhancement, the record does not reveal any tasks requiring the exercise of judgment and the decisionmaking authority that are the essence of managerial discretion within the meaning of the guideline. See Tiojanco, 286 F.3d at 1021. Instead, one finds only ministerial tasks and the exercise of social skills.
Unfortunately, in an effort to affirm the district court, the majority has significantly diluted the guidelines’ concept of professional and managerial discretion. Moreover, contrary to our precedent, the majority comes perilously close to equating lack of supervision with the exercise of discretion. Thus, the majority’s conclusion that the application of the position of trust enhancement was proper in this case represents a sharp departure from our precedent and the once coherent body of law that applied to this issue. I respectfully dissent.

. I concur with the majority's rejection of appellant's claim that the district court failed to consider the evidence about her mental health.

. The full quotation from this decision refers to “complex, situation-specific decisionmaking.” Id. at 1021 (emphasis added). I think that the use of the adjective "complex” overstates this otherwise useful proposition.

. I note that some of Tann's responsibilities — such as hiring employees and managing expenditures, id. at 870-71, — might amount to managerial discretion under some circumstances. Such tasks are not at issue in this case, and I therefore need not decide whether they would reflect ''managerial discretion” in the context of appellant's job. Nonetheless, managing expenditures might well amount to ''managerial discretion” of the kind contemplated by the guideline, and I am uneasy with Tann to the extent that it concludes otherwise.

. I do agree with the majority’s suggestion in footnote 6 of its opinion that our review of the imposition of the position of trust enhancement ordinarily involves a "mixed question of law and fact, with a sliding scale of review depending on whether the trial judge’s conclusion is more law-oriented or more fact-driven.”

. The majority cites Chanthaseng, 274 F.3d at 590, for the proposition that "when a supervisor fails to review the financial transactions carried out by an employee, as here, effectively giving the employee significant discretion, we have held that the enhancement applies.” The facts of that case, however, are quite different. The defendant in Chanthaseng became the "sole decision-maker” for certain financial transactions. Id. at 589. By contrast, appellant was not authorized to make any decisions about financial transactions for the CGF and the medical office. She was not authorized to write checks, manage, or move money; she was only authorized to deposit it in a specified account. As with the case of an embezzling bank teller, the fact that she did otherwise does not make hers a position of trust.

. The PSR explains:
The CGF had a supply of blank, unsigned checks at Dr. Walton’s office, which were drawn off of the CGF account and intended primarily for use in funding research grants. During all relevant periods, Dr. Walton was the named trustee and sole authorized signatory on the CGF bank account. He neither delegated signature authority to Sicher, nor authorized, directed, or otherwise suggested that Sicher obtain a signature stamp with his name.

. The Second Circuit has more recently relied on the proposition that “applicability of a § 3B1.3 enhancement turns on 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong.' " United States v. Allen, 201 F.3d 163, 166 (2d Cir.2000) (quoting United States v. Viola, 35 F.3d 37, 45 (2d Cir.1994)); see also United States v. Laljie, 184 F.3d 180, 195-96 (2d Cir.1999). We have explicitly rejected that proposition. See Parilla-Román, 485 F.3d at 191; Reccko, 151 F.3d at 33 ("It is true that in dealing with the position-of-trust enhancement courts occasionally have emphasized the employee's freedom to commit wrongs that defy facile detection. But these decisions deal with earlier versions of § 3B1.3 and, thus, antedate the Sentencing Commission's emphasis on managerial or professional discretion....”).

. Importantly, we remarked in O’Connell that, taken alone, O’Connell's lack of legal signatory authority on the company’s checking account, and the fact that he clearly exceeded his authority by writing checks to himself, would have suggested “that it was not professional discretion that facilitated the commission of O’Connell’s crimes, but merely his access to the [company] checkbook.” 252 F.3d at 528. In this sense, Sicher’s situation is comparable to O'Connell’s: she had access to the office and CGF checking accounts, but no signatory authority on either account.